He will be seated. Good afternoon. Mr. Clerk, will you call the next case? Case number 319-0248 Michael Torres and Jamie Gibson, propellants by Scott Gibson v. Peoria Park District, doing business as Camp Wakanda, Appalachia, Adamstown Mr. Gibson, you may proceed. Thank you. May it please the Court, Counsel. Judge, in this case, the facts are not in dispute. This is a pleadings case. The plaintiff's appeal was based on the fact that the trial court erred in misapplying its gatekeeper, pre-discovery duty and responsibilities by dismissing the plaintiff's case at the pleading stage. The legal analysis was just wrong. You can see that the Court specifically said in its ruling, which was transcribed and part of the record for your honors, that the transcribed record was part of the ruling. So what does the ruling say? We know that the law is very clear that the judge in this case has to accept all well-pleaded facts as true. He did not. He questioned certain facts as to whether the truth of them was really true in terms of what the Camp Wakanda representative did in terms of directing our clients to actually use the polls that they knew were dangerous. Reasonable inferences, the second thing. The Court was responsible and must take the reasonable inferences from the facts that are pled. The Court specifically said, reasonable inferences, that's negligence and I'm not going to do that. Another error. Strictly construe the evidence against the governmental entity. That's a well-known principle, well-accepted for many, many decades, and he failed to do that. Number four, the facts must be construed most favorably to the plaintiff. Again, he did not do that as evidenced by his ruling. And the Court must find that no set of facts, quote unquote, could support willful and wanton case based upon the particular facts of this particular case. And respectfully, we submit that that is absolutely wrong. The facts are very clear. This is not a close case. That willful and wanton at the pleading stage is very well pled and proved and should be accepted so that we can move on to discovery and trial. There are a lot of cases that have been cited throughout the brief, so I'm not going to, you know, be tedious with that. But the Supreme Court in Barr less than three years ago wrote the definition, and I'll just quote it very briefly, if you'll indulge me. Willful and wanton conduct requires a conscious choice of course of action with knowledge of facts which will disclose their danger to any reasonable person. A conscious choice of course of action does not require the defendant government entity to know exactly when the injury is going to happen or to witness it. It's a conscious choice of a course of action. The facts pled here show just that. The safety policy. I call it a safety policy because that's a very reasonable inference. In the defense brief and the argument in the trial court said, how do you know it's a safety policy? It's obvious that if it's not just a safety policy, one of the reasons for Camp Wakanda's policy in prohibiting hammocks and other materials from being hung on those pools, poles, reasonably can be inferred because of safety. Why is it so obvious? How do we know there is even a policy? We know because of the context of these facts. The policy was put in the Peoria police officer's police report. He was very bold. He wanted everybody to know. When he visited my clients who were severely injured, one of whom ended up having a spinal fusion, when he visited them in the hospital, he told them, you know, you are in violation of our policy. We don't allow things being hung, let alone a hammock. Well, in that context, why would the policy be anything but safety? He was there because the poles had cracked and severely injured my clients when they were sitting in a camping hammock at the camping site designated by Camp Wakanda specifically for their use. I submit to you that's more than a reasonable inference that this is a safety policy. Is that from the police officer at the emergency room? Yes. It's in the police report. Does your amended complaint allege that the police officer is an employee of the park district? Yes. Okay. The way it works at Camp Wakanda is that they don't have their own police department. They use the Peoria police department. Including the transcript has been very helpful, so I have had a chance to read that. Yes. And what's really significant here is this isn't a matter of just the camp negligently maintaining their property or not having a proper inspection system. You've got to look at all the facts in total. They not only had actual knowledge as evidenced by their safety policy, but what they did was, as you know, our clients were looking at the camp to use the hall for possibly their wedding reception. They went down six months earlier before their injury. They set up a meeting. A Camp Wakanda representative met them. The defendant argued, how do you know it's a Camp Wakanda representative? Well, they set up the meeting to have a tour of Camp Wakanda. The person took them on the tour with a Camp Wakanda uniform. And I think that, again, would leave any reasonable person to believe that that is a Camp Wakanda employee or agent. And that agent or employee is duty and obligated to know the policies of its employer. What did that person do? You know, it's a sales job, right? This isn't free. They're trying to sell their camp services. So they say to our clients who are going to get married, hey, we're going to take you to one of the designated campsites that you might want to come to. This is going to be yours exclusive use. This is all in the pleadings. And amongst other things, selling points, we've got these two poles here. Use them for whatever you want. They used them for whatever they want, a reasonable thing to do when you go camping when you've got parallel poles with eye hooks and nails, obviously for holding something in a perfect spot to put your camping hammock, is to put them on the poles. They didn't say that they were dangerous. They didn't say they had a policy that you can't hang a hammock. They didn't say anything. It's not on their website. It's not assigned anywhere. No notice to anyone. It's just some policy that they have. But they knew it was unsafe, and they directed our clients to do something that the ongoing course of conduct was. They knew that it was unsafe. And what happened? Plaintiffs get there. They put up their camping hammock. What do you do with a hammock? You sit in a hammock. The weight of the hammock caused one of the poles to immediately crack, crash over their heads and faces and chest, resulting in severe head injuries, chest injuries, punctured lung, et cetera. What could be more foreseeable than that happening? These poles had been there at least 42 years, since 1975. They had never been changed. And, in fact, after the injury, one of the Camp Wakanda people told a family member. That's not relevant to what happened afterwards, is it? Well, it's relevant in the sense that the representative said, we've had other things break and fall. So he shows knowledge that prior to the injury, they were aware that things fell on people that were part of the tree. He did say a tree. He did not say a pole. But we do have allegations in our complaint that prior poles had broken. And, again, these are well-plated facts that have to be accepted as true. So when you put all that together in the context of these facts in this case, it surely shows that willful and wanton, on the pleading stage, without any discovery, is more than met in terms of our Supreme Court burden under bar. The defendant, in its brief and at the trial court, spent a lot of time individually looking at certain facts. Well, this fact isn't willful and wanton. This fact isn't willful and wanton. This fact isn't willful and wanton. Okay. Who cares? It doesn't matter. You've got to look at the context of everything. All of these facts put together show the willful and wanton standard. In the interest of time, I'm just going to briefly address two other issues that the defense has brought up, which I think are complete red herrings. One is, were the plaintiffs intended users? How can they say they're anything but intended users? They told them to use the polls for anything they want. The defense says, well, you know, we had a policy they shouldn't use the polls, so they're not intended users. What? If they're not intended users, it's not open and obvious, and the defense surely didn't plead that or even argue it in this case, that there was any danger about the polls. So if you're going to say you can't use the poll but we're not going to tell you, and then when you use the poll, after we tell you to use the poll, now you're not intended users? Absurd. The other issue, actual notice, I've addressed this earlier, but the actual notice, again, is obvious based upon their safety policy, that they had noticed that these polls were dangerous and could not safely and properly hold a hammock or other appreciable weight. What other reasonable inference is there for a policy prohibiting the use of hammocks and other things hanging from the poll, which is expressed by the police officer on the day of the injury, other than the fact that they knew the polls were unsafe? These are reasonable inferences, but they go beyond that. They're very strong inferences that we'll obviously need to explore in detail in discovery. So respectfully taking the totality of the facts, putting them all together, we submit that the trial court erred in dismissing this case so early on, based just on the pleading stage. Those five different facts of analysis that the trial court made mistakes on are very important. Individually, I think they require reversal. Collectively, they definitely require reversal. Didn't take all facts as true. Didn't accept reasonable inferences. Didn't strictly construe against the municipality. Didn't accept that the facts had to be most favorably looked at on behalf of the plaintiff and must make a finding that absolutely no set of facts could support Woelfel and Watten in this case. And we believe that the facts show, and the evidence of this case show, that unfortunately the trial court made a mistake. They erred. We respectfully request that you reverse the trial court. Get us back into the trial court. Let us do our discovery and try the case. I have a question. I always seem to be the one that asks questions. Thank you. I'd be happy to try to answer. Well, I'm going to pretend I haven't read anything in this file, and I'm just listening to your argument. But I assure you that it's not true. I'm having trouble believing what was Woelfel here, what was Watten. Is it the refusal to post the notice of the policy? Is it the refusal to notify of the dangerous condition? Or is it a Woelfel dissemination of misinformation that they could use? All three. So what we have, again, is there's the lack of notice and knowledge to the plaintiffs. If the defendant had said, don't use those poles or put up a sign, these poles are dangerous, don't hang some, we wouldn't be here. You say all three. So is one enough, or do you think all three have to be read? One is enough. One is enough. One is enough. Two is enough. One, two, or three. Because when you look at it, it's a very unusual set of facts where you have- Is there any other theory of Woelfel-ness that I have missed? It's all bundled up into the knowledge from the safety policy where it was not disseminated. Okay. And also, in light of that, they actually told the plaintiffs to use a dangerous item on their property, knowing that it was dangerous and it was very foreseeable that it would break and hurt somebody. Okay. I appreciate you drawing the picture. Sometimes that's what it did. Thank you. So specifically, what are you saying is the course of action? The course of action is- That leads to what? The ongoing course of action is the knowledge of the safety policy, the fact that they didn't disseminate it, tell it to the plaintiffs or anybody else that I can gather, and then they intentionally told someone, we know this is unsafe to use the poles, but you can use them for anything you want without restriction. I mean, that's an ongoing course of conduct over six months. The first visit was six months before they got injured. They arrived six months later to further have a campsite weekend and to look at the place. And then when they are told to use the poles that are dangerous, they break. That's an ongoing course of conduct that I would argue is very clear. No other poles have broken before, is that right? In our complaint, we do have an allegation that there were prior poles that broke. And we have an allegation that there were prior other things, such as trees, rotten trees that fell. I'll be happy to try to answer any other questions. Thank you, Your Honor. Thank you, Mr. Gibson. Mr. Chair? Counsel, ladies and gentlemen, I want to start where the opposing counsel was ending before he took those last two questions. And he asked this Court to return us back to the trial court so that discovery could be done. And I want to point the Court to a case we cited in our brief, which was Allen v. Peoria Park District, which was decided right here in this case, or in this courtroom, rather. And Allen v. Peoria Park District, of course, demonstrates that you're not allowed to file a faulty or deficient complaint, slide through, and then go get discovery in search of facts to support your complaint. That's exactly what the plaintiff asked the Court to allow to happen in this case. And I think that's specifically contrary to the Allen case. As I listened to opposing counsel's oral argument, I was struck by the absence of a couple things. Absence of reference to the statutory law, which is key in this case. Absence to the vast number of appellate decisions cited by the defendant in this case. No attempt to distinguish those cases at all in any way. And absence of specific facts pled that would support willful and wanton conduct. As you asked Justice Carter at the end, is there any evidence of prior polls falling? And there's not. There's the bare allegation in the plaintiff's second amended complaint that prior polls have fallen, but there are no specifically pled facts that would support that. Without that, if the pleadings taken as true, one, that there is a policy against placing anything, putting anything up on those polls, and two, that they weren't told about that policy and were told that they could put anything they wanted on those polls. So just given that set of circumstances, isn't it willful? If you are the one holding the policy, you are the one who is in charge of what people put up. You know you're not supposed to do it, and yet you go out and try to sell your product by saying you can put anything you want there. Doesn't that mean, I mean, you know, I understand it has to be, you know, all but intentional. Wouldn't that make that reasonable? So I think my answer is threefold to that. First of all, it's speculation to say if it is a quote-unquote safety policy. Second, assuming. I didn't say policy. Okay. I didn't say safety. Okay. I didn't say policy. Okay. So but assuming that it is a safety policy, I think that cuts in favor of the defendant, in favor of the park district, because as Section 1-210 sets forth the definition of willful conduct, it's an utter disregard for the safety of others. By having a policy or a safety policy in place, we're doing exactly the opposite. Why does it count if you're not telling anybody about it? Well, so that points us to the Britten case then, Justice. Sorry to interrupt. No, that's okay. So the Britten case, I think, is a factually analogous case. That's a case where a minor was, and of course it's in our brief, but it's a case where a minor was injured on a motorbike riding through dirt trails. And then once the lawsuit was filed, the plaintiff alleged in the complaint that there was an ordinance that the local public entity had put in place against motorbike riding, that they also had police officers who failed to enforce the ordinance, and in fact told the children, go ahead, it's okay to ride out there. So as we look at the Britten case, all of that conduct, not enforcing the ordinance, telling the children that it was okay to ride out there, is very similar to this if you assume the plaintiff's allegations are true. Here we allegedly have to assume they're true. Right. Here we have allegedly a Park District employee telling the plaintiffs that, yes, you can use these, et cetera. And just because the policy was not posted or not enforced as it was not in Britten, that does not make willful unwanted conduct. But isn't the difference that the officers in Britten said, yeah, you're not supposed to be there, but it's okay, go ahead, because we don't enforce that. But here the allegation is not only was this employee saying it's okay, but there was no knowledge that it wasn't okay. There was no, oh, yeah, we don't let you do that, but you guys go ahead. Isn't it that, you know, we have this policy, and without, you know, just taking it upon themselves to say, no, we're not going to advise you of it. It's not as if it is in the nature of an ordinance or a statute that is public. So, you know, this is something, I guess, that was internal to them, apparently. But, you know, if you take the pleadings, it seems that there's policy of some nature that not only appears to have not been enforced, but it's actually just not being utilized at all, even though for whatever reason, it appears that there's a reason for that policy. And if that employee doesn't say, yeah, they don't like that or they don't want you to do it, they just said, no, go ahead, do it tomorrow. Well, first, I think it is still fairly valid in Britten. But secondarily, I would argue to you that even the failure by the public employee of the Park District to identify the policy is nothing more than negligence. It doesn't give rise to that high standard. And it is a high standard to prove willful unwanted conduct. The Thurman v. Champaign Park District case very clearly said that it's a more stringent and different standard and it's a high standard to make. So for that reason, I think it is a different scenario. If the Park District employee failed to tell these campers about the policy, that's mere negligence. On top of that, there are no facts pledged that the Park District had any knowledge, any notice, any suggestion that these campers might go out there and try to hang hammocks on these poles. I think we're implying a certain amount of knowledge to the Park District employee and whether or not they advised these campers of the alleged policy or safety policy not to hang things on the poles. The Park District employees had no knowledge of their intent to go use those poles to hang hammocks or had no knowledge to suspect that they might hang a hammock and two of them get in the hammock so as to bear that weight on the pole. Really? In a campground? With eye hooks? Yeah. You wouldn't think that maybe somebody would think to put a hammock up? You know, as you look at those eye hooks, the picture, the eye hooks appear to be at the bottom of the one broken pole, so I'm not sure that the eye hooks are as helpful to the plaintiff's case as they would have you believe. They don't appear to be at the top of the pole. Even so, even so, there's no indication that the Park District employee had any knowledge that they might use those hammocks. The problem that I'm having with your argument is, and I distinguish the case law that you've relied on, is an ordinance gives everybody constructive notice of a policy. And in this case, there is no constructive notice of a policy and there's a directive from an employee, you can do that. So that's where I think the distinction is. Well, and again, as I said... Can I just speak to that? Yeah, so... It's not that there was conflicting directions between an ordinance and what the police officer said, because if you're getting mixed messages, it should have constructive notice that the message is mixed. Maybe there is negligence, but here, no constructive notice and a directive to do anything. Right, but the case law here, so essentially it's a failure to warn of the safety policy, and the case law... It's a decision to ignore a safety policy by the employee. Well, I guess that almost imputes some sort of malicious behavior on the part of the Park District employee. Willful and wanton. But it's only willful and wanton if you know that they might use those hammocks, and then you fail or you decide to ignore the policy and procedure. There's no way to know what every camper at the campground will do. That's probably your best argument. I understand your position. And the case law that we cited in our appellate brief is clear that there is no duty to warn, and the duty to warn is negligence, not willful and wanton conduct. And I wanted to turn back to... Let me follow up on those questions. You're down to our interpretation in light of these pleadings of the statute where we're talking about the statute defines willful and wanton conduct. And it appears that the major part of your argument so far has been the definition of willful and wanton I was concentrating more on the first part of the sentence, which means a course of action, and you have to have a course of action. Yes, we do. And so one of the major questions appears to me is what is the course of action we're talking about in light of these pleadings? But then a course of action which shows an actual or deliberate intention to cause harm, and that appears to be much of your argument is concentrating on that phrase, shows an actual or deliberate intention to cause harm. But then it says, or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property. Now, how do the arguments as pled in this, because we're talking about pleading now, and we're not the federal standard, the EEE, those things, so we're not that area in Illinois. We're in a different area, whether or not the pleadings of factually well pled give rise to this willful and wanton conduct. So what is it that touches on the utter indifference to or conscious disregard for the safety of others? Because it appears much of your argument deals with the first part of that statutory section. Well, Judge, I guess I would... For a course of conduct, she had the indifference. Yeah, and I don't think there is any pleading or any evidence, any facts pled that show a course of conduct. Essentially, they hang their head on this one allegation that the Park District employee said you could use these poles for any use you want to at the campsite. The case law has repeatedly demonstrated that it has to be a course of conduct. It cannot be one single act of inadvertence, incompetence, et cetera.  They plead that these poles are there. They're things on poles where you can attach stuff, right? Yes, they do. And there might be questions on how high they are and how low they are and so forth. But there are places where, evidently, there's spots where you can hang things. There are eye hooks on the poles. And so would that plead an utter indifference or conscious disregard for the safety of others? Absolutely not. I can't imagine a scenario where eye hooks alone on the pole rise to the standard of utter indifference or disregard for the safety of others. I mean, so it's a campsite, right? It is a campsite. And people hang tents, all kinds of things on poles. They do. They do. But the mere idea of having an eye hook alone, I don't think, shows a conscious disregard for the safety of others, especially if you assume that there is this policy or this safety policy in place where they are enacting some rules or standards for the protection of the safety of others, if you assume it is a safety policy. Again, the failure to discuss with the campers the safety policy is an act of inadvertence or incompetence and mere negligence. It does not rise to the standard of willful multi-crime. But having a policy in place and then advising people to go ahead and do something, perhaps with a conscious disregard of this thing that is a known danger or a known prohibition. But I guess two things. One, I would go back to the Grin case with the police officer saying you don't have to follow the order and just don't worry about it. I think it is the same thing. Secondarily, there is no known danger to these poles. There's no facts pledged to suggest that there have been other injuries from these poles. There are no facts pledged to suggest that the park district had any actual or constructive knowledge that these poles were in some way rotted on the inside. Remember, the alleged dangerous condition here is the rotting of the poles from the inside. There is no allegations to suggest that the park district had any advanced knowledge that these poles were, in fact, a dangerous condition. And I think that's something that's been overlooked in the argument so far. Simply having these poles with the eyelets out at the campsite in and of itself is not a dangerous condition unless you have some advanced actual knowledge that the poles were, A, rotting or, B, there had been prior injuries. And there's no allegations, no facts pledged to support either one of those suggestions. Counsel has two minutes. Thank you. So for the reasons I've stated and the reasons we've stated in our brief, we do believe that the plaintiff's allegations fail to rise to the level of willful and wanted conduct. I would point the Court to the Thurman v. Champaign Park District case and the Leha v. Community Unit School District case as demonstrating that the allegations here are not, in fact, significant or sufficient enough to rise to the level of willful and wanted conduct. And I also wanted to point the Court to the Pomero case. The Pomero case stands for the idea that allowing a condition or a piece of property on a local public entity's property to fall into disrepair is not willful and wanted conduct. And so at most, that's what I would suggest here also, is that, well, at most the pole fell into disrepair over the 42 years of its life and became rotted from the inside out. That is not enough to rise to willful and wanted conduct. In the Pomero case, the gym teacher or the teacher at the school was instructing students to run the distance on the asphalt that had become loose and crumbly and broken. And there the appellate court said not only the instruction to go run on the asphalt but the failure to maintain the asphalt, those two things together did not rise to the level of willful and wanted conduct. I think that's very applicable and very similar to this case. The instruction of the Park District employee to go ahead and use those poles for whatever you want to use them and allowing the post allegedly to fall into disrepair, they don't rise to the level of willful and wanted conduct, especially in the Pomero case, which I think is exactly on point. My question with regard to these poles, as you say, there's a pleading now which say there were problems with poles in the past and there's debate factually whether that turns out to be true or not, but in the pleading they talk about the poles. But in the element of willful and want, when you look at the statute definition that we've talked about here, you're hanging your hat in part on, well, we didn't have any knowledge of any prior problems with any of these poles. They've been around for 40-some years. They've been okay. But then does the fact that there was a policy in the Park District, does that play against your theory of a case at this pleading stage where willful and want sometimes has been defined as knows or other, you know, by case law, knows that others have been injured. That doesn't happen here, according to what you've said. And that knows that others have been injured or intensely has a safety feature or device from recreational property, I mean, removed a safety device. Well, there's not a removal of a safety device in this case from a pleading, but you've got a safety rule in place, which would that inert to the fact that, well, there was knowledge there could be a problem with these poles because you've got a safety feature in place that says don't use the poles for certain kinds of weight-bearing activities. Would that then be the knowledge that you, the very fact you have this rule in place shows that you have knowledge that these poles could be a problem? I think to get there, you have to, the plaintiff asks you to speculate to get to that point. Speculate that it's a safety policy. Speculate that it's a policy that's been put in place because of concern about weight-bearing. If you read the Peoria Police Department report, it doesn't say because of weight-bearing. We're reading additional things into the police report. But isn't it the statement, also the police officer's actual statement, verbal statement at the emergency room? That's part of the complaint, correct? As I read and remember that, the statement is that we have a policy that you're not allowed to hang things on parts of the park district, trees, poles, etc. I don't think there's anything that states that it was because of weight-bearing issues, safety issues, etc. And so to come back and answer your question then, I think the answer is, again, as I said earlier, I think the idea that because we have, again, assuming that it's a safety policy, we have a policy in place that does show conscious regard for the safety of others. Now, whether or not they knew the policy was in place, like in Britain, that's a different argument, a different issue. But I don't think it cuts against us as to being willful and wanted conduct. At most, it's negligent conduct that the park district employee did not tell them about this policy not to hang things. There's no intent to harm. There's no utter disregard for their safety. At most, the park district employee simply failed to advise them of the policy and procedure. And that question seems to be one of the essential questions in this case, isn't it, at a pleading stage? It is one of the questions in this case. But again, when you compare it to the voluminous cases that we cite in our appellate brief, I think you see that the Banhart case, the Thurman case, the Leahy case, this case is much more similar. And in several of those cases, there are many more specifically-plagued facts that would relate to knowledge, etc. In the Leahy case, for example, that's the case where the student was injured using a volleyball crank. There were actual prior injuries with a volleyball crank that were alleged and pled, and the court in Leahy still said that that was not sufficient to rise to the level of willful and wanted conduct. Actual prior injuries. We don't even have that here. We have pled here, though. We have pled here about prior incidents with balls. There's an allegation that the Park District employees told them that a tree fell, and there's a better allegation that prior poles have fallen. But again, the idea of prior poles having fallen, that does not demonstrate a defect or an actual dangerous condition in the poles on this particular campground. That other poles have fallen on this acreage does not demonstrate a defect with this actual pole. I think you misspoke. You said on this campground. Did you mean campsite? Well, I was saying generally because there are other campsites within the campground, and there are poles on numerous other campsites, not just this one campsite. So that there were poles throughout this campground on various different campsites, and that one had fallen at some other campground in some other time under what circumstances, we don't know, heavy wind, whatever, doesn't demonstrate a dangerous condition in the particular poles on the particular campsite that the plaintiffs used on that day. There's simply no evidence of any allegations that there was anything wrong with the poles on this campground ahead of them being on that campsite. Time is up, Counselor. Have I answered? No. Thank you. Mr. Gibson. Thank you. Briefly, just in rebuttal to some of the points, and you've already made some of my arguments, but I just want to make sure that you're clear on the record as to what Defense Counsel said. The actual statement in the pleadings is taken directly verbatim from the Peoria police officer's police report. It says, I advise that it is Peoria Park District policy that we do not allow erecting hammocks or any other object. So it's not a situation where the policy is some vague situation where we don't know what it is, and it's not speculation. It's more than a reasonable inference. It's a very strong inference. That's why the police officer was telling them that. He's bragging a little bit. You know, you guys screwed up. You didn't follow our policy. But Justice Wright hit it right on the head, and also Justice O'Brien and Justice Carter, you all did. How can you be in violation of a policy that's not published? It's ridiculous to compare this to the Brenton case. As you stated, an ordinance is a public law. We are all presumed to know the public laws of who govern us. But when you have a policy in a private entity that's not published anywhere, it's internal, how can anybody know it unless you tell us? In the brief, I said as an example, it might sound a little silly, but under their theory, you could have a park with a baseball diamond, and you could put a fence around it, and you could have a policy in your park district saying, I only want certain people to be able to play baseball, but I'm not going to tell anybody about it. And then as soon as someone else plays baseball and gets hurt, we're going to say you're not an intended user. Well, it's a diamond. It's in a park. There's no restrictions. In this case, it's even stronger because as all of your honors have pointed out, this isn't negligence. Defense counsel argued about it's only negligence if we didn't take care of our property. They had a policy. They knew the polls were unsafe. And the key factor here is it wasn't benign. It was acute. It was action. You can use the polls for anything you want. That's a specific direction to a customer. And when that selling point is made and they accept that, as you stated, forget about the eye hooks. They're there, so what? It could have been a hammock. It could have been a tent. It could have been a bag to hold food so bears don't get it. Who knows? But anything that's going to be on that poll shouldn't be there because it's unsafe, and that's because it's their policy, and that's because they have actual knowledge that it's unsafe to have anything on the polls, and yet they tell our clients, go use the polls for anything you want when you pay us a fee to use our campsite. And we're going to direct you to that campsite, and we've got polls there for your use. So I hope that you use our services and we make some money. Isn't it also almost an attractive nuisance with a directive to use it? I'm thinking of quicksand in some of the cases. There's quicksand in the area. They've owned the park for 40 years. They know the conditions of the park, and they say to the parents, kids can't cross that sand to reach the beach or reach the water. To me, there's a little analogy about an attractive nuisance. You have two poles there. You better be clear and tell them they can't be used for hammocks. Sure, because the obvious use is parallel poles. How else do you hang a hammock, a camping hammock? You have to have two things that are the proper distance apart that are parallel to each other. I recognize the Boy Scouts probably used them for banners. But nobody else knew that, right? And then finally, I just wanted to point out, defense counsel started talking about discovery. I've never argued that we're here to try to get discovery to prove our case. I just stated at the pleading stage, I think the record's very strong and very clear that the trial court made a mistake. And by that mistake, we've never got a chance to go forward. And I'm just asking for you to let us go forward. Thank you. Thank you, Mr. Gibson. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be given to you as soon as possible. And with that, we will take a brief recess for a panel change.